# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIDLEY AUSTIN (DC) LLP,<br>1501 K Street, N.W.,<br>Washington, DC  20005,<br><br>                Plaintiff,<br><br>v.<br><br>CENTERS FOR MEDICARE<br>   & MEDICAID SERVICES,<br>7500 Security Boulevard,<br>Baltimore, MD  21244,<br><br>                Defendant. | Civil Action No.<br><br>**FREEDOM OF INFORMATION ACT COMPLAINT** |

## SUMMARY OF THE ACTION

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, to obtain important records from the Centers for Medicare and Medicaid Services ("CMS"). Specifically, this action seeks to compel CMS to produce materials that are related to, and should have been released with, a Proposed Rule regarding the Medicare Advantage ("MA") program. The Proposed Rule was published on November 1, 2018, and, if finalized, would significantly change the way CMS evaluates and validates risk adjustment payments to MA organizations. *See generally* 83 Fed. Reg. 54,982 (Nov. 1, 2018).

2. The MA program is a private-public partnership in which private health insurers provide health insurance and other benefits to qualified Medicare beneficiaries who elect MA coverage. Created in 2003, the MA program has been a remarkable success. Numerous studies have shown that beneficiaries who elect to join the MA program receive more benefits and higher quality medical care, while paying significantly lower premiums and copays, than beneficiaries

who remain in traditional Medicare. In light of these benefits, approximately 35% of eligible Medicare beneficiaries have elected to join the MA program.

3. One of the most important differences between the MA program and traditional Medicare is the way in which MA organizations are compensated. In traditional Medicare, healthcare providers generally are compensated on a fee-for-service ("FFS") basis, which rewards the *quantity* of care provided. In contrast, MA organizations receive a flat monthly payment from CMS, which creates an incentive to reduce costs by providing higher *quality* care.

4. For the MA program to work, the monthly payments to MA organizations must reflect the specific circumstances of each beneficiary. By statute, CMS must "adjust" the monthly payments to MA organizations "for such risk factors as [beneficiary] age, disability status, gender, institutional status, and … health status." 42 U.S.C. § 1395w-23(a)(1)(C)(i). Further, the risk adjustment payments to MA organizations must "ensure actuarial equivalence" with traditional Medicare. *Id.*; *cf.* Exec. Order No. 13,890, 84 Fed. Reg. 53,573, 53,574 (Oct. 8, 2019) (directing the Secretary of Health and Human Services to "ensure that, to the extent permitted by law, FFS Medicare is not advantaged or promoted over MA with respect to its administration").

5. In February 2012, CMS appeared to realize that its approach to risk adjustment was not achieving actuarial equivalence. At the time, CMS issued a final methodology for its risk adjustment data validation ("RADV") audits of MA organizations that included statistical sampling and extrapolation. However, because CMS does not conduct similar audits of the traditional Medicare program, that methodology created an actuarial imbalance. To correct the problem, CMS adopted a measure called the Fee-for-Service ("FFS") Adjuster. The FFS Adjuster restores actuarial equivalence by defining an acceptable level of payment error for an MA organization based on the level of similar errors in traditional Medicare. CMS, *Notice of Final*

*Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, 4-5 (Feb. 24, 2012).[1]

6. When it adopted the FFS Adjuster, CMS stated that the size of the FFS Adjuster would be "calculated by CMS based on a RADV-like review of records submitted to support FFS claims data." *Id.* Based on the available documentation, it appears that CMS's initial review indicated that the amount of the FFS Adjuster should be around 5%, while a subsequent, larger review found that it should be between 4.8% and 8.1%. Griffin Decl. Exhibit A at 2; Exhibit B at 5. The same documents indicate that CMS officials concluded that "the right thing to do" would be to adopt a FFS Adjuster at the higher end of the range. Griffin Decl. Exhibit B at 4-5.

7. In an opinion dated September 7, 2018, the Honorable Judge Rosemary M. Collyer of this court confirmed that the FFS Adjuster is necessary to ensure actuarial equivalence. *See UnitedHealthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173 (D.D.C. 2018). Judge Collyer determined that a CMS rule that purported to force MA organizations to return any and all "overpayments" was invalid. As the court explained, the "crucial data mismatch" between the MA program and traditional Medicare requires an adjustment to maintain actuarial equivalence, regardless of whether the question arises when CMS conducts a RADV audit or when MA organizations attempt to self-identify overpayments. *Id.* at 187.

8. The government responded to Judge Collyer's ruling by issuing the Proposed Rule mentioned above and, specifically, by proposing to eliminate the use of the FFS Adjuster in all contexts. *See* 83 Fed. Reg. at 55,041. The proposal was based on an internal CMS analysis purporting to show that errors in the traditional Medicare program have no actuarial impact on MA payments. *Id.* at 55,040-41. Based on the same study, the government moved Judge Collyer to

---

[1] https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf

reconsider her ruling regarding actuarial equivalence.  According to the government, the actuarial problem that the court "believed would be 'inevitable' does not in fact occur."  Defendants' Rule 60(b) Mot. for Partial Reconsideration at 11, *UnitedHealthcare Ins. Co. v. Azar*, No. 16-157, ECF No. 76 (D.D.C., filed Nov. 5, 2018).

9. When the Proposed Rule was released, it was readily apparent that CMS had failed to disclose the information necessary to enable stakeholders to evaluate and respond to the study. At the time, the ***only*** materials related to the study that were publicly available were two brief summaries published to CMS's website on or about October 26, 2018.  The data underlying the study had been withheld, the programming and other methodologies used had not been disclosed, and many critical questions remained unanswered.

10. Several stakeholders promptly demanded that CMS produce the missing data and information regarding its study.  The Administrative Procedure Act ("APA") requires that CMS provide full transparency regarding both the studies that allegedly support its policy proposals and those that do not, such as the prior reviews mentioned above in Paragraph 6.  *See, e.g.*, *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) ("[I]n order to allow for useful criticism, it is especially important for the agency to identify and make available *technical studies and data* that it has employed in reaching the decisions to propose particular rules.") (quoting *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 530 (D.C. Cir. 1982)); *see also Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 263 (D.D.C. 2015) ("The Court agrees that the Secretary's failure to disclose the critical assumptions relied upon by the HHS actuaries deprived Plaintiffs and other members of the public of a meaningful opportunity to comment …"). Policies established by CMS and the Department of Health and Human Services ("HHS") to implement the Data Quality Act ("DQA") similarly call for a high degree of transparency regarding

studies that are intended to influence and inform important policy decisions. HHS, *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of the Information Disseminated to the Public*, Part II(E), Section V(D) (Oct. 1, 2002) ("Data Quality Guidelines") ("If an agency is responsible for disseminating 'influential' information, guidelines for dissemination should include a high degree of transparency about data and methods to facilitate its reproducibility by qualified third parties. Information is considered influential if it will have a substantial impact on important public policies or important private sector decisions.").[2]

11. Some stakeholders, including Plaintiff, buttressed their requests for transparency by filing formal FOIA requests to obtain the relevant information. Plaintiff's first FOIA request was filed on November 9, 2018, and is attached to this Complaint as Exhibit 1 ("First Request"). Among other things, the First Request sought all "data, studies, [and] analyses" related to the study underlying the Proposed Rule, as well as any communications CMS may have had with third parties regarding the rule or the study. CMS acknowledged receipt of the First Request and granted expedited treatment on November 13, 2018. The First Request was assigned FOIA control number 110920187047 (Pin DRRB).

12. Plaintiff's second FOIA request was filed on December 4, 2018 and is attached to this Complaint as Exhibit 2 ("Second Request"). The Second Request requested additional materials related to the methodologies used in the study underlying the proposed rule, as well as all records related to the prior reviews, mentioned above, that CMS conducted in connection with its 2012 policy. CMS acknowledged receipt of the Second Request and granted expedited treatment on February 26, 2019. The Second Request was assigned FOIA control numbers 022520197041 (Pin VA59) and 120720187005 (Pin SQ7X).

---

[2] https://aspe.hhs.gov/report/hhs-guidelines-ensuring-and-maximizing-quality-objectivity-utility-and-integrity-information-disseminated-public.

13. Plaintiff's third FOIA request was filed on December 13, 2018 and is attached to this Complaint as Exhibit 3 ("Third Request"). CMS's operational policies require that the Office of the Actuary within CMS be involved in, and sign off on, any studies or analyses involving actuarial calculations. *See* Data Quality Guidelines, Part II(E), Section V(B) ("Actuarial estimates are subject to the standards of that profession and are certified by the Chief Actuary."). Accordingly, the Third Request sought all records related to the involvement of the Office of the Actuary in conducting the study or otherwise preparing the Proposed Rule. CMS acknowledged receipt of the Third Request on January 23, 2019. The Third Request was assigned FOIA control number 121420187009 (Pin 5LD9). Unlike the prior two requests, the Third Request was not granted expedited treatment.

14. Between December 2018 and June 2019, CMS made certain additional disclosures regarding its study. First, in December 2018, CMS extended the comment period for the Proposed Rule by four months and announced that it "plan[ned] to release data underlying [its] study." 83 Fed. Reg. 66,661 (Dec. 27, 2018). Second, in March 2019, CMS announced the availability of certain data sets and tables. 84 Fed. Reg. 8,069 (Mar. 6, 2019). Third, in April 2019, CMS provided another four-month extension of the comment period. 84 Fed. Reg. 18,215 (Apr. 30, 2019). This additional extension was necessary because CMS planned "to replicate" its study because "[c]ertain intermediate data elements [were] not saved in the implementation of the initial study" and, therefore, could not be released to the public. *Id.* at 18,216. Finally, CMS released additional data, documentation, and programming related to its initial and replicated studies in June 2018. 84 Fed. Reg. 30,983 (June 28, 2019).

15. Despite these additional disclosures, a significant amount of materials and information remains undisclosed. For instance, CMS still has not revealed what role, if any, the

Office of the Actuary played in CMS's study or in preparing the Proposed Rule. As another example, CMS has not answered key questions regarding how it created the samples of traditional Medicare claims used to conduct its study. Nor has it provided any meaningful information about the claims included in its sample.

16.     Further, the materials released in June 2019 themselves pointed to the existence of other, undisclosed records. The programming files released by CMS in June 2019 revealed that the study described in the Proposed Rule was actually based on a prior, undisclosed study conducted in March 2018. The programming files identified the March 2018 iteration by filename and also identified specific document directories on a CMS server that presumably contain still more prior iterations on the study. Indeed, the programming files create the appearance that the study cited in the Proposed Rule might be nothing more than an evolution of the original reviews conducted in connection with the 2012 policy mentioned above. Disclosure of those files could show that CMS has been repeatedly examining the same data, while altering its methodologies to generate different results.

17.     In any event, CMS has failed to respond adequately to any of Plaintiff's FOIA requests. CMS made one interim production regarding the First Request on December 17, 2018, but that production consisted entirely of non-responsive material and was explicitly not a final determination regarding the request. CMS has not made any further productions related to the First Request, and it has not made any productions whatsoever in response to the Second Request or the Third Request. Nor has CMS made a "determination" with respect to any of the requests within the meaning of 5 U.S.C. § 552(a)(6)(A)(i).

18.     Plaintiff has written to CMS to urge it to comply with its FOIA obligations on several occasions. Most recently, on June 1, 2020, Plaintiff asked that CMS begin producing

material responsive to the requests, on which CMS had taken effectively no action for the past year. Plaintiff further asked that CMS prioritize the production of (1) the additional programming files and file directories referenced in CMS's June 2019 release of information; (2) materials related to the reviews CMS conducted in connection with its 2012 policy; and (3) materials related to the involvement of the Office of the Actuary. Plaintiff explained that in the absence of this minimal production, it would have no choice but to seek judicial relief.

19. Because CMS has not responded to Plaintiff's offer, Plaintiff has no choice but to bring this action to compel immediate disclosure of all responsive records.

## JURISDICTION AND VENUE

20. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

21. Venue is appropriate in this District under 5 U.S.C. § 552(a)(4)(B).

22. Plaintiff has exhausted its remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

## PARTIES

23. Plaintiff Sidley Austin (DC) LLP, a Delaware limited liability partnership, is a law firm located in Washington, DC. Plaintiff is part of the global law firm Sidley Austin LLP headquartered in Chicago, Illinois.

24. Defendant CMS is a division of the United States Department of Health and Human Services, and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## GENERAL ALLEGATIONS

25. On November 9, 2018, Plaintiff filed the First Request with CMS. *See* Exhibit 1. Among other things, the First Request sought disclosure of all records "containing any and all data,

studies, analyses, communications, and or other information, regardless of form, that CMS considered, reviewed, created, received, or relied upon in connection with the Proposed Rule." *Id.* at 1. The First Request specified several examples of the data and analyses that must be produced, including those pertaining to how CMS created a subset of traditional Medicare claims to analyze, as well as the data related those claims. *See id.* at 2. The First Request also requested that CMS produce the medical records that were reviewed, the justifications for its key assumptions, and its communications with third-parties. *See id.*

26. On December 4, 2018, Plaintiff filed the Second Request with CMS. *See* Exhibit 2. Among other things, the Second Request sought disclosure of all other FOIA requests that CMS had received related to the Proposed Rule, as well as any responses thereto. *See id.* at 1. The Second Request also sought disclosure of the protocols or statistical analysis plans that CMS followed in conducting its current study, as well as all records related to the prior reviews of Medicare claims that CMS conducted in connection with its 2012 policy. *See id.* at 1-2.

27. On December 13, 2018, Plaintiff filed the Third Request with CMS. *See* Exhibit 3. The Third Request principally sought disclosure of any records related to the involvement of the Office of the Actuary in the Proposed Rule or CMS's study. *See id.* at 1-2.

28. All three of the requests asked for expedited processing.

29. By letter dated November 13, 2018, CMS acknowledged that it had received the First Request and assigned it control number 110920187047 (Pin DRRB). CMS further granted expedited processing because Plaintiff had demonstrated a "compelling need" and stated that responsive documents would be produced "as soon as practicable." Exhibit 4.

30. On December 17, 2018, CMS provided a "First Interim Response" letter and a set of documents in response to the First Request. Exhibit 5. CMS stated that it was continuing to

9

search and review records responsive to the Request, and that "[o]nce CMS completes the processing of all records and provides you with our final response letter, appeal rights will be granted as required by 5 U.S.C. 552(A)(6)(A)(i)(aa)." *Id.*

31. On December 18, 2018, Plaintiff responded that the documents produced were "an irrelevant collection of already public documents on various topics, none of which appear to be related to the Proposed Rule or, more specifically, CMS's proposed risk adjustment methodology." Exhibit 6 at 2. CMS did not respond to this letter.

32. By letter dated January 23, 2019, CMS acknowledged that it had received the Third Request and assigned it control number 121420187009 (Pin 5LD9). Exhibit 7. The letter did not address Plaintiff's request for expedited processing.

33. On February 6, 2019, Plaintiff called CMS and asked about the status of the Second Request, which had not yet been acknowledged by CMS. CMS informed Plaintiff an acknowledgment letter was forthcoming.

34. On February 7, 2019, Plaintiff sent a letter to CMS emphasizing CMS' failure to meaningfully respond to its FOIA requests and requesting that CMS provide the requested records and data immediately. Exhibit 8.

35. On February 26, 2019, Plaintiff received an emailed letter from CMS acknowledging the Second Request and assigning control number 120721087005 (Pin SQ7X). Exhibit 9. Plaintiff subsequently received a hard copy letter from CMS, also dated February 26, 2019, that also acknowledged receipt of the Second Request, but assigned a different control number: 022520197041 (Pin VA59). Exhibit 10. The hard copy letter further stated that CMS had granted expedited processing of the Second Request. *Id.* at 2.

10

36. On March 1, 2019, Plaintiff sent another letter to CMS asking that the agency immediately make responsive productions. Exhibit 11. CMS did not respond to this letter.

37. On April 11, 2019, Plaintiff again sent a letter to CMS, reminding CMS that it had granted expedited processing, but had still not produced any responsive documents. Exhibit 12. CMS did not respond this letter.

38. On June 1, 2020, Plaintiff sent a final letter to CMS regarding the three outstanding FOIA requests. Plaintiff asked that CMS begin producing material responsive to the requests, on which CMS had taken effectively no action for the past year. Plaintiff further asked that CMS prioritize the production of (1) the additional programming files and file directories referenced in CMS's June 2019 release of information; (2) materials related to the reviews CMS conducted in connection with its 2012 policy; and (3) materials related to the involvement of the Office of the Actuary. Plaintiff explained that in the absence of this minimal production, it would have no choice but to seek judicial relief. Exhibit 13. As of the date of this complaint, CMS has not responded to the June 1 letter.

39. Despite these efforts Plaintiff has not received any responsive production to any of the three Requests. In fact, other than an "interim" production of non-responsive materials, CMS has not provided any substantive responsive to the three Requests. CMS certainly has not made a "determination" with respect to any of the Requests within the meaning of 5 U.S.C. § 552(a)(6)(A)(i). Because CMS has defaulted on its obligations under FOIA, Plaintiff brings this action to compel immediate disclosure of all responsive records.

40. Disclosure of the requested materials will advance the public interest by enabling stakeholders to better respond to CMS's study and the Proposed Rule to which it pertains. Moreover, disclosure is necessary in light of the unusual risk in this case that the requested

materials have not been appropriately preserved. As noted above, *see supra* ¶ 14, CMS has made the extraordinary concession that data elements related to the first iteration of its study were lost or destroyed. *See* 84 Fed. Reg. at 18,216.

## CAUSE OF ACTION

### Violation of the Freedom of Information Act

41. Plaintiff repeats and realleges paragraphs 1–40, as if fully set forth herein.

42. Plaintiff, through the Requests, asked for records within Defendant's control.

43. Plaintiff has exhausted any applicable administrative remedies.

44. Defendant's failure to timely respond to Plaintiff's Requests violates 5 U.S.C. § 552(a)(6)(A)(i), and Defendant's own regulations promulgated thereunder, in that Defendant failed to issue a determination within twenty days of Plaintiff's Requests, as statutorily required.

45. Defendant's failure to promptly make available the records sought by Plaintiff's requests violates 5 U.S.C. § 552(a)(3)(A).

46. Defendant's failure to release the records sought by Plaintiff's Requests violates 5 U.S.C. § 552(a), in that Defendant has withheld records, without justification, responsive to Plaintiff's Requests, and failed to provide any determination with respect to Plaintiff's request.

### REQUESTED RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) order Defendant to promptly conduct a search for any and all records responsive to Plaintiff's Requests, including all responsive records created between the date of submission of the earliest Request (November 9, 2018) and the date of production, waiving all processing fees, and demonstrate that it employed search methods reasonably likely to lead to the discovery of records responsive to Plaintiff's Requests;

(b) order Defendant to produce, by a date certain, any and all non-exempt and partially exempt records responsive to the Requests and a Vaughn index of any responsive records withheld or partially withheld under claim of exemption;

(c) enjoin Defendant from withholding any non-exempt records responsive to the Requests;

(b) award Plaintiff costs and reasonable attorneys' fees incurred in this action; and

(c) grant such other relief as the Court may deem just and proper.

Dated: July 10, 2020                                     Respectfully submitted,

*/s/ William A. Sarraille*

William A. Sarraille (Bar ID # 431872)
Sean C. Griffin (Bar ID # 499537)
Kyle J. Fiet (Bar ID # 988894)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
wsarraille@sidley.com
sgriffin@sidley.com
kfiet@sidley.com